EXHIBIT
1

The Free Market
Environmental Law Clinic

# REQUEST UNDER THE FREEDOM OF INFORMATION ACT

October 24, 2017

Freedom of Information Office
NIEHS
P.O. Box 12233
Research Triangle Park, NC 27709

**BY ELECTRONIC MAIL — niehsfoia@niehs.nih.gov**

**RE:     FOIA Request – Certain NIEHS records re: Thomas Sinks/IARC/Glyphosate**

To NIEHS Freedom of Information Officer,

On behalf of the Free Market Environmental Law Clinic (FME Law) and the Energy &
Environment Legal Institute (E&E Legal), please accept this request pursuant to the Freedom of
Information Act (FOIA), 5 U.S.C. § 552 *et seq.*  FME Law and E&E Legal are non-profit public
policy institutes organized under section 501(c)3 of the tax code and with research, investigative
journalism and publication functions, as well as a transparency initiative seeking public records
relating to environmental and energy policy and how policymakers use public resources, all of
which include broad dissemination of public information obtained under open records and
freedom of information laws.

Please provide us, within twenty working days,[1] copies of: *all electronic correspondence*
(which includes emails, SMS, texts, WhatsApp, Signal, etc.) and attachments which were:

---

[1] *See Citizens for Responsible Ethics in Washington v. Federal Election Commission*, 711 F.3d 180, 186
(D.C. Cir. 2013), and discussion, *infra*.

The Free Market
Environmental Law Clinic

1. **a)** sent to or from (including also as cc: or bcc:) Linda Birnbaum (of NTP and NIEHS), which

was **b)** also sent to or from (including also as cc: or bcc:) Thomas Sinks, of EPA's Office of the

Science Advisor, *and/or* **c)** sent to or from (including also as cc: or bcc:) John Ray Bucher (of

NIEHS's NTP); *and*

**2.** which correspondences uses any of the following *anywhere* in the email thread, whether in the

including addresses, Subject field, body or attachments: glyphosate, IARC, EFSA, and/or

"Cancer Assessment Review Committee" or its acronym "CARC".

  **Records responsive to this request will be dated between July 21, 2015 and the date**

**you process this request, inclusive.**

  **We request entire email threads** of which any responsive correspondence is a part,

mindful also of the DC Circuit's ruling in *American Immigration Lawyers Association v.*

*Executive Office for Immigration Review* (D.C. Cir. July 29, 2016).[2]

  **We do not seek correspondence that merely forwards press clippings, such as news**

**accounts or opinion pieces, if that correspondence has no comment or no substantive**

**comment added by any party** in the thread (an electronic mail message that includes any

expression of opinion or viewpoint would be considered as including substantive comment;

examples of non-responsive emails would be those forwarding a news report or opinion piece

with no comment or only "fyi", or "interesting").

---

[2] https://www.cadc.uscourts.gov/internet/opinions.nsf/BCEF1EB7B6536FD285257FFF0054F06F/$file/
15-5201-1627649.pdf, "we find no statutory basis for redacting ostensibly non-responsive information
from a record deemed responsive. Under the statutory framework, once the government concludes that a
particular record is responsive to a disclosure request, the sole basis on which it may withhold particular
information within that record is if the information falls within one of the statutory exemptions from
FOIA's disclosure mandate".



This request follows up on widespread news reports[3] raising questions about the federal government's work on risk assessments of the agricultural chemical glyphosate including that EPA hurriedly removed from its website the Final Report of the Cancer Assessment Review Committee on Glyphosate, a report whose conclusions run counter to the 2015 IARC Monograph 112 on Glyphosate.[4]

Last week, however, Reuters reported that, e.g., "changes to the [IARC] draft, reviewed by Reuters in a comparison with the published report, was the removal of multiple scientists' conclusions that their studies had found no link between glyphosate and cancer in laboratory animals. In one instance, a fresh statistical analysis was inserted - effectively reversing the original finding of a study being reviewed by IARC."[5]

A summary of the IARC study was published in The Lancet Oncology (Guyton, K. Z. et al. *Lancet Oncol*. http://dx.doi.org/10.1016/S1470-2045(15)70134-8 (2015). This was followed by a spate of decisions among apparently intertwined groups (which have obvious staff and

---

3 See e.g., P.J. Huffstutter, EPA takes offline report that says glyphosate not likely carcinogenic, Reuters, May 2, 2016; Carey Gillam, What is going on with glyphosate? EPA's odd handling of controversial chemical, Huffington Post, May 2, 2016; Mairead McGuinness, First shots fired in a renewed battle over agri chemicals, Irish Independent, May 3, 2016; Timothy Cama and Devin Henry, EPA accidentally posts pesticide review, The Hill, May 2, 2016; Michael Bastasch, EPA Quickly Takes Study Offline Showing No Evidence Weed Killer Causes Cancer, Daily Caller, May 3, 2016; Marc Heller, E&E News, May 5, 2016.

4 International Agency for Research on Cancer Volume 112: Some organophosphate insecticides and herbicides: tetrachlorvinphos, parathion, malathion, diazinon and glyphosate. IARC Working Group. Lyon; 3–10 March 2015. *IARC Monogr Eval Carcinog Risk Chem Hum*.

5 Kate Kelland, "In glyphosate review, WHO cancer agency edited out 'non-carcinogenic' findings", October 19, 2017, http://www.reuters.com/article/us-who-iarc-glyphosate-specialreport/in-glyphosate-review-who-cancer-agency-edited-out-non-carcinogenic-findings-idUSKBN1CO251?feedType=RSS&feedName=topNews&utm_source=twitter&utm_medium=Social.



participant overlap) to undertake similar efforts, for no readily apparent reason for the coincidences. We note this has also drawn the interest of congressional oversight.

It also follows reports that the IARC Monograph may be the product of and/or materially influenced by unalterably closed minds and/or materially conflicted parties and, in sum, have resulted from insufficiently unbiased deliberations.

Agency records obtained of late suggest that agency employee involvement in the above machinations is of continued and further public interest. For example, correspondence produced by another federal agency shows parties including Birnbaum, Sinks, and Portier, reflecting a specific *outcome* of policies whose development they are involved in influencing (e.g., 11/27/2015 email from Birnbaum to Portier copying, *inter alia*, Sinks, desiring "some hold on the extensive use of this…", referencing glyphosate (ellipses in the original), while elsewhere vowing (feigning?) objectivity).

Requesters are interested in the relationships between NIEHS employees and the individuals who produced the IARC Monograph among other efforts as just described, and specifically how these relationships might have impacted, or what they show about, the sudden spate of decisions among interrelated groups to study glyphosate as well as EPA's remarkable May 2016 publish/unpublish episode regarding its CARC report.  This requires we obtain public records reflecting certain relevant information.

We are interested in the nature of these intertwining relationships, and NIEHS (taxpayer) support of certain institutions/projects. Plainly, the issue is of great public interest, as well as being highly policy-relevant.

The Free Market
Environmental Law Clinic

### NIEHS Owes Requesters a Reasonable Search, Which Includes a Non-Conflicted Search

FOIA requires an agency to make a reasonable search of records, judged by the specific facts surrounding each request. *See e.g., Itrurralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994).

It is well-settled that Congress, through FOIA, "sought 'to open agency action to the light of public scrutiny.'" *DOJ v. Reporters Comm. for Freedom of Press*, 498 U.S. 749, 772 (1989) (*quoting Dep't of Air Force v. Rose*, 425 U.S. 353, 372 (1976)). The legislative history is replete with reference to the "'general philosophy of full agency disclosure'" that animates the statute. *Rose*, 425 U.S. at 360 (*quoting* S.Rep. No. 813, 89th Cong., 2nd Sess., 3 (1965)). The act is designed to "pierce the veil of administrative secrecy and to open agency action to the light of scrutiny." *Department of the Air Force v. Rose*, 425 U.S. 352 (1976). It is a transparency-forcing law, consistent with "the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Id*.

A search must be "reasonably calculated to uncover all relevant documents." *See, e.g., Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). In determining whether or not a search is "reasonable," courts have been mindful of the purpose of FOIA to bring about the broadest possible disclosure. *See Campbell v. DOJ*, 164 F.3d 20, 27 (D.C. Cir. 1999) ("reasonableness" is assessed "consistent with congressional intent tilting the scale in favor of disclosure").

The reasonableness of the search activity is determined ad hoc but there are rules, including that the search must be conducted free from conflict of interest. (In searching for



relevant documents, agencies have a duty "to ensure that abuse and conflicts of interest do not

occur." *Cuban v. S.E.C.*, 744 F.Supp.2d 60, 72 (D.D.C. 2010).  *See also Kempker-Cloyd v.*

*Department of Justice*, No. 97-cv-253, 1999 U.S. Dist. LEXIS 4813, at *12, *24 (W.D. Mich.

Mar. 12, 1999) (holding that the purpose of FOIA is defeated if employees can simply assert that

records are personal without agency review; faulting the Department of Justice for the fact that it

"was aware that employee had withheld records as 'personal' but did not require that 'he submit

those records for review' by the Department.).

### Withholding and Redaction

Please identify and inform us of all responsive or potentially responsive records within

the statutorily prescribed time, and the basis of any claimed exemptions or privilege and to which

specific responsive or potentially responsive record(s) such objection applies.

If NIEHS claims any records or portions thereof are exempt under one of FOIA's

discretionary exemptions we request you exercise that discretion and release them consistent

with, e.g., statements by President Obama and Attorney General that "**The old rules said that if**

**there was a defensible argument for not disclosing something to the American people, then**

**it should not be disclosed. That era is now over, starting today" (President Barack Obama**,

January 21, 2009), and "**Under the Attorney General's Guidelines, agencies are encouraged**

**to make discretionary releases. Thus, even if an exemption would apply to a record,**

**discretionary disclosures are encouraged**.  Such releases are possible for records covered by a

number of FOIA exemptions, including Exemptions 2, 5, 7, 8, and 9, but they will be most

applicable under Exemption 5." (Department of Justice, Office of Information Policy, OIP

Guidance, "Creating a 'New Era of Open Government'"). Moreover, we note that information

cannot be exempt from production as "proprietary" information if it was widely disseminated

outside NIEHS and any organization with proprietary rights to the data in question.

Nonetheless, if your office takes the position that any portion of the requested records is

exempt from disclosure, please inform us of the basis of any partial denials or redactions. In the

event that some portions of the requested records are properly exempt from disclosure, please

disclose any reasonably segregable, non-exempt portions of the requested records. See 5 U.S.C.

§552(b).

Further, we request that you provide us with an index of those documents as required

under V*aughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), with sufficient specificity "to permit a

reasoned judgment as to whether the material is actually exempt under FOIA" pursuant to

*Founding Church of Scientology v. Bell*, 603 F.2d 945, 959 (D.C. Cir. 1979), and "describ[ing]

each document or portion thereof withheld, and for each withholding it must discuss the

consequences of supplying the sought-after information." *King v.  Department of Justice*, 830 F.

2d 210, 223-24 (D.C. Cir. 1987).

We remind NIEHS it cannot withhold entire documents rather than produce their "factual

content" and redacting any confidential advice and opinions. As the D.C. Circuit Court of

Appeals noted, the agency must "describe the factual content of the documents and disclose it or

provide an adequate justification for concluding that it is not segregable from the exempt

portions of the documents." *Id.* at 254 n.28.  As an example of how entire records should not be

withheld when there is reasonably segregable information, we note that basic identifying



information (who, what, when) is not "deliberative".  As the courts have emphasized, "the deliberative process privilege directly protects advice and opinions and *does not permit the nondisclosure of underlying facts* unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process." *See Mead Data Central v. Department of the Air Force*, 566 F.2d 242, 254 n.28 (D.C. Cir. 1977) (emphasis added).

If it is your position that a document contains non-exempt segments and that those non-exempt segments are so dispersed throughout the documents as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed through the document. *See Mead Data Central v.  Department of the Air Force*, 455 F.2d at 261.

**Claims of non-segregability must be made with the same practical detail as required for claims of exemption in a *Vaughn* index**. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

**Satisfying this request contemplates providing copies of documents, in electronic format if you possess them as such, otherwise photocopies are acceptable**.

Please provide responsive documents in complete form, with any appendices or attachments as the case may be.

<u>**Request for Fee Waiver — Three in the Alternative, NIEHS Must Consider All**</u>

**This discussion through page 24** is detailed as a result of our recent experience of agencies improperly using denial of fee waivers to impose an economic barrier to access, an improper means of delaying or otherwise denying access to public records, despite our history of

regularly obtaining fee waivers. We are not alone in this experience.[6] ***It is only relevant if your
agency considers denying our fee waiver***.

## A.  Pursuant to the Public Interest, 5 U.S.C. § 522(a)(4)(A)(iii)

1.  <u>Subject of the Request</u>

Potentially responsive records will inform the public about certain NIEHS activities
relating to interaction with foreign governmental and/or international agencies and its treatment
of data relating to glyphosate.  As previously discussed, the information sought will provide
important insights into the described public policy-related issues.  The requested records thus
clearly concern the operations and activities of government.

We emphasize that a requester need not demonstrate that the records would contain any
particular evidence, such as of misconduct. Instead, the question is whether the requested
information is likely to contribute significantly to public understanding of the operations or
activities of the government, period. *See Judicial Watch v. Rosotti*, 326 F. 3d 1309, 1314
(D.C.Cir. 2003).

2.  <u>Informative value of the information</u>

FOIA requesters and other individuals and organizations concerned with good
government and otherwise concerned with wise use of taxpayer money, and sound environmental
and energy policy, have a clear interest in this topic.  The widespread media interest in recent

---

[6] *See* February 21, 2012 letter from public interest or transparency groups to four federal agencies
requesting records regarding a newly developed pattern of fee waiver denials and imposition of
"exorbitant fees" under FOIA as a barrier to access, available at http://images.politico.com/global/
2012/03/acluefffeewvrfoialtr.pdf; *see also National Security Counselors v. CIA* (CV: 12-cv-00284(BAH),
filed D.D.C Feb. 22, 2012); *see also* "Groups Protest CIA's Covert Attack on Public Access,"
OpentheGovernment.org, February 23, 2012, http://www.openthegovernment.org/node/3372.



federal government actions relating to Glyphosate, as well as our information and belief about

outside interests' participation in the U.S. taxpayer-funded IARC panel further demonstrates the

significant public interest in this information. The agency's copies are public records.  The public

has no other means to secure this information other than through the Freedom of Information

Act.  This makes the information sought highly likely to significantly contribute to an

understanding of government operations and activities.

    3.   <u>Contribution to an understanding by the general public.</u>

       Requesters have a record of obtaining and producing information as would a news media

outlet and as a legal/policy organization that broadly disseminates information on important

energy and environmental policy related issues, including how various agencies related to energy

and environmental policies conduct themselves related to transparency efforts from outside

organizations such as E&E Legal and FME Law.  In addition to being functionally a news outlet,

both requesters have disseminated their work in a manner that results in coverage by national

news outlets on television, in national newspapers, and in policy newsletters from state and



National policy institutes.[7]  Requesters have a recognized interest in and reputation for leading relevant policy debates and expertise in the subject of energy and environment-related regulatory policies, including how related agencies respond to transparency efforts, and they and their staffs' publications demonstrate requesters have the "specialized knowledge" and "ability and intention" to broadly disseminate the information requested in the broad manner, and to do so in a manner that significantly contributes to the understanding of the "public-at-large."

---

[7] Print examples, only, to the exclusion of dozens of national electronic media broadcasts, include, *e.g.*, Dawn Reeves, EPA Emails Reveal Push To End State Air Group's Contract Over Conflict, INSIDE EPA, Aug. 14, 2013; Editorial, Public interest group sues EPA for FOIA delays, claims agency ordered officials to ignore requests, WASHINGTON EXAMINER, Jan. 28, 2013; Michal Conger, Emails show green group influence on EPA coal rule, WASHINGTON EXAMINER, Jan. 9, 2014; C.J. Ciaramella, Sierra Club Pressed EPA to Create Impossible Coal Standards, WASHINGTON FREE BEACON, Jan. 10, 2014; C.J. Ciaramella, Emails Show Extensive Collaboration Between EPA, Environmentalist Orgs, WASHINGTON FREE BEACON, Jan. 15, 2014; Stephanie Paige Ogburn, Climate scientists, facing skeptics' demands for personal [sic] emails, learn how to cope, E&E NEWS, Jan. 21, 2014; Anthony Watts, New FOIA emails show EPA in cahoots with enviro groups, giving them special access, WATTS UP WITH THAT, Jan. 15, 2014; Stephen Dinan, Obama energy nominee Ron Binz faces rocky confirmation hearing, WASHINGTON TIMES, Sep. 17, 2013; Stephen Dinan, Top Obama energy nominee Ron Binz asked oil company employees for confirmation help, WASHINGTON TIMES, Sep. 17, 2013; Vitter, Issa Investigate EPA's Transparency Problem, More Suspicious E-mail Accounts, WATTS UP WITH THAT, Jan. 29, 2013 ("It should also be noted that this has come to light thanks to the work of Chris Horner and ATI, who forced production of these documents by EPA in their FOI litigation."); Stephen Dinan, Obama energy nominee in danger of defeat, WASHINGTON TIMES, Sept. 18, 2013; Stephen Dinan, Greens, lobbyists and partisans helping Ron Binz, Obama's FERC pick, move through Senate, WASHINGTON TIMES, Sep. 12, 2013; Stephen Dinan, Energy nominee Ron Binz Loses voltage with contradictions, Obama coal rules, WASHINGTON TIMES, Sep. 22, 2013; Conn Carroll, FOIA reveals NASA's Hansen was a paid witness, WASHINGTON EXAMINER, Nov. 7, 2011; NASA Scientist accused of using celeb status among environmental groups to enrich himself, FOX NEWS, Jun. 22, 2011; Editorial, The EPA: A leftist agenda, PITTSBURGH TRIBUNE-REVIEW, Jan. 18, 2014; John Roberts, "Secret dealing"? Emails show cozy relationship between EPA, environmental groups, FOX NEWS, Jan. 22, 2014; Elana Schor, Proponents pounce on emails between EPA, enviros on pipeline, E&E NEWS, Jan. 23, 2014; Mike Bastasch, Analysis: Green Hypocrisy in Keystone XL pipeline opposition, DAILY CALLER, Feb. 6, 2014; Mark Tapscott, Emails expose close coordination between EPA, Sierra Club and other liberal environmental activist groups, WASHINGTON EXAMINER, Jan. 23, 2014; Editorial, EPA has ties to radical environmentalists, DETROIT NEWS, Feb. 13, 2014; Michael Bastasch, Report: EPA coal plant rule tainted by secretiveness, collusion with green groups, DAILY CALLER, Mar. 10, 2014; Jennifer G. Hickey, Legality of EPA Rules Questioned by Environmental Litigators, NEWSMAX, March 21, 2014; Michael Bastasch, Confidential document reveals the Sierra Club's plan to shut down the coal industry, DAILY CALLER, Mar. 26, 2014, Michael Bastasch, Conservative group sues EPA over its 'IRS-like' tactics, The Daily Caller, Apr. 1, 2014; Stephen Dinan, Conservative group sues EPA over open-records requests, WASHINGTON TIMES, Apr. 1, 2014.

---

The Free Market
Environmental Law Clinic

4.   Significance to Public Understanding

As explained above, only by NIEHS releasing this information will public interest groups

such as requesters, the media, and the public at large see these terms first hand and draw their

own conclusions concerning the interactions and relationship between international agencies and

the NIEHS (and NTP) and EPA.

**B.   Commercial Interest of Requesters**

1.   No Commercial Interest

Requesters are organized and recognized by the Internal Revenue Service as 501(c)(3)

educational organizations.  Requesters do not charge for copies of reports.  The requested

information is not sought for a commercial purpose and cannot result in any form of commercial

gain to requesters, who have absolutely no commercial interest in the records.

2.   Primary Interest in Disclosure

With no possible commercial interest in these records, an assessment of that non-existent

interest is not required in any balancing test with the public's interest. Requesters also satisfy this

factor as news media outlets.[8]

As such and also for the following reasons requesters seek waiver or reduction of all

costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any

charge…if disclosure of the information is in the public interest because it is likely to contribute

significantly to public understanding of the operations or activities of government and is not

---

[8] See discussion below.

primarily in the commercial interest of the requester") (As we request documents in electronic

format, there should be no copying costs).

As non-commercial requesters, requesters are entitled to liberal construction of the fee

waiver standards. 5 U.S.C. § 552(a)(4)(A)(iii), *Perkins v. U.S. Department of Veterans Affairs*,

754 F. Supp. 2d 1 (D.D.C. 2010).  Specifically, the public interest fee waiver provision "is to be

liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological*

*Seepage Situation v. Carlucci,* 835 F. 2d 1284, 2184 (9th Cir. 1987).  FOIA is aimed in large part

at promoting active oversight roles of watchdog public advocacy groups.  "The legislative

history of the fee waiver provision reveals that it was added to FOIA 'in an attempt to prevent

government agencies from using high fees to discourage certain types of requesters, and

requests,' in particular those from journalists, scholars and nonprofit public interest groups."

*Better Government Ass'n v. State*, 780 F.2d 86, 88-89 (D.C. Cir. 1986)(fee waiver intended to

benefit public interest watchdogs), citing to *Ettlinger v. FBI*, 596 F. Supp.867, 872 (D.Mass.



1984); SEN. COMM. ON THE JUDICIARY, AMENDING THE FOIA, S.REP. NO. 854, 93rd

Cong., 2d Sess. 11-12 (1974)).[9]

Congress enacted FOIA clearly intending that "fees should not be used for the purpose of

discouraging requests for information or as obstacles to disclosure of requested information."

*Ettlinger v. FBI*, *citing* Conf. Comm. Rep., H.R. Rep. No. 1380, 93d Cong., 2d Sess. 8 (1974) at

8.  Improper refusal of fees as a means of withholding records from a FOIA requester constitutes

improper withholding.  *Ettlinger v. FBI.*  Given this, "insofar as ...[agency] guidelines and

standards in question act to discourage FOIA requests and to impede access to information for

precisely those groups Congress intended to aid by the fee waiver provision, they inflict a

continuing hardship on the non-profit public interest groups who depend on FOIA to supply their

lifeblood -- information." *Better Gov't v. State* at 94 (internal citations omitted). The courts

therefore will not permit such application of FOIA requirements that "'chill' the ability and

willingness of their organizations to engage in activity that is not only voluntary, but that

Congress explicitly wished to encourage." *Id*.

---

[9] This was grounded in the recognition that the two plaintiffs in that merged appeal were, like requesters, public interest non-profits that "rely heavily and frequently on FOIA and its fee waiver provision to conduct the investigations that are essential to the performance of certain oft heir primary institutional activities -- publicizing governmental choices and highlighting possible abuses that otherwise might go undisputed and thus unchallenged. These investigations are the necessary prerequisites to the fundamental publicizing and mobilizing functions of these organizations. Access to information through FOIA is vital to their organizational missions." *Better Gov't v. State* at 93. They therefore, like requesters, "routinely make FOIA requests that potentially would not be made absent a fee waiver provision", requiring the court to consider the"Congressional determination that such constraints should not impede the access to information for appellants such as these." *Id*.

As such, agency implementing regulations may not facially or in practice interpret FOIA's fee waiver provision in a way creating a fee barrier for requesters. "This is in keeping with the statute's purpose, which is 'to remove the roadblocks and technicalities which have been used by . . . agencies to deny waivers.'" *Citizens forResponsibility & Ethics in Washington v. U.S. Dep't of Educ.*, 593 F. Supp. 261, 268 (D.D.C.2009), *citing to McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th.Cir. 1987)(quoting 132 Cong. Rec. S16496 (Oct. 15, 1986) (statement of Sen. Leahy). Requesters' ability to utilize FOIA -- as well as many nonprofit organizations, educational institutions and news media who will benefit from disclosure -- depends on its ability to obtain fee waivers. For this reason, "Congress explicitly recognized the importance and the difficulty of access to governmental documents for such typically under-funded organizations and individuals when it enacted the 'public benefit' test for FOIA fee waivers. This waiver provision was added to FOIA 'in an attempt to prevent government agencies from using high fees to discourage certain types of requesters and requests,' in a clear reference to requests from journalists, scholars and, most importantly for our purposes, nonprofit public interest groups. Congress made clear its intent that fees should not be utilized to discourage requests or to place obstacles in the way of such disclosure, forbidding the use of fees as '"toll gates" on the public access road to information.'" *Better Gov't Ass'n v. Department of State* 780 F.2d 86, 94 (D.C. Cir. 1986). As the Better Government court also recognized, public interest groups employ FOIA for activities "essential to the performance of certain of their primary institutional activities — publicizing governmental choices and highlighting possible abuses that otherwise might go undisputed and thus unchallenged. These



investigations are the necessary prerequisites to the fundamental publicizing and mobilizing functions of these organizations.  Access to information through FOIA is vital to their organizational missions."  That is true in the instant matter as well.

Courts have noted FOIA's legislative history to find that a fee waiver request is likely to pass muster "if the information disclosed is new; supports *public* oversight of agency operations, including the quality of agency activities and the effects of agency policy or regulations on public health or safety; *or, otherwise confirms or clarifies data on past or present operations of the government.*" *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d at 1284-1286. (*emphasis added)*. This information request meets that description, for reasons both obvious and specified.  The subject matter of the requested records specifically concerns identifiable operations or activities of the government.  The requested records, pertain to NIEHS's activities of great public interest, as previously described.  They also directly relate to high-level promises by the President of the United States and the Attorney General to be "the most transparent administration ever."  This transparency promise, in its serial incarnations, demanded and spawned widespread media coverage, and then of the reality of the administration's transparency efforts, and numerous transparency-oriented groups reporting on this performance, prompting further media and public interest (*see, e.g.*, an internet search of "study Obama transparency").

As such, requesters have stated "with reasonable specificity that their request pertains to "operations of the government," and "the informative value of a request depends not on there

being certainty of what the documents will reveal, but rather on the requesting party having

explained with reasonable specificity how those documents would increase public knowledge of

the functions of government." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of*

*Health and Human Services*, 481 F. Supp. 2d 99, 107-109 (D.D.C. 2006).

**In The Alternative, E&E Legal and FME Law Qualify as a Media Organization under 5**
**U.S.C. § 522(a)(4)(A)(ii)(II)**

As authorized under FOIA, NIEHS must waive fees for representatives of the news

media. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II).  In the alternative, if NIEHS denies requesters' fee

waiver under FOIA's public interest prong, E&E Legal and FM Law meet the criteria for a fee

waiver as a representative of the news media; also, FME Law meets this test, as a "representative

of the news media" is defined as any person actively gathering information about current events

or of current interest to the public ("news") for an entity that is organized and operated to publish

or broadcast news to the public. Office of Management and Budget Guidelines, 52 Fed. Reg.

10012, 10018 (March 27, 1987).

The White House Office of Management and Budget (OMB) published guidance on its

interpretation of the term "representative of the news media." OMB includes in this category

publishers of newsletters and similar periodicals, publishers of books, and radio and television

broadcasting.  However, "labels and titles alone do not govern; the organizations' substantive

activities control."  *Elec. Privacy Info. Ctr. v. DOD*, 241 F. Supp. 2d 5, 21 (D.C.D.C. 2003).

Courts have affirmed that non-profit requesters like E&E Legal and FME Law who are

not traditional news media outlets can qualify as representatives of the new media for purposes



of the FOIA.  *See ACLU of Washington v. U.S. Dep't of Justice*, No. C09-0642RSL, 2011, 2011 U.S. Dist. LEXIS 26047 at *32 (W.D. Wash. Mar. 10, 2011). *See also, Serv. Women's Action Network v. DOD*, 2012 U.S. Dist. Lexis 45292 (D. Conn., Mar. 30, 2012). The courts use a three prong test of an organization's activities. A representative of the news media is a person or entity that (1) gathers information of potential interest to a segment of the public; (2) uses its editorial skills to turn the raw materials into a distinct work; and (3) distributes that work to an audience. *Nat'l Sec. Archive v. U.S. Dep't of Def.*, 880 F.2d 1381, 1387, 279 U.S. App. D.C. 308 (D.C. Cir. 1989).  This reflects OMB's regulatory preamble language indicating a representative of the news media must "perform an active rather than passive role in dissemination." OMB Guidelines, 52 Fed. Reg. at 10015. Requesters meet all three prongs.

1.   E&E Legal and FME Law seek information of interest to a broad segment of the public.

E&E Legal and FME Law have taken a leadership role of late in assessing various agencies compliance with the President's commitment to transparency.  Evidence that such information is of potential interest to a segment of the public is manifest in the use of this information by other publication entities, lawmakers and the public, a point we make explicit in this request. E&E Legal and FME Law has an established practice of using FOIA to educate the public, lawmakers and news media about the government's operations and, in particular, has brought to light important information about policies grounded in energy and environmental policy, as well as how agencies react to transparency efforts.

2.   <u>E&E Legal and staff use their editorial skills to turn the raw materials into distinct work</u>

E&E Legal uses editorial skills to turn raw materials into distinct work published by its

staff and affiliated professionals.  Thomas Tanton, E&E Senior Fellow, authored E&E Legal's

report entitled "The Hidden Cost of Wind Energy."  E&E Legal and FME Law staff not only has

a lengthy history of turning raw materials into distinct works, and specifically news articles, they

have done so as staff to E&E Legal and for E&E Legal publications, as discussed above, and

plan on doing so again, using, in part, the documents received under this request.

3.   <u>E&E Legal and FME Law distributes that work to an audience</u>

The key to whether an organization merits "media" fee waiver is whether a group publishes,

as E&E Legal most surely does. In *National Security Archive v. Department of Defense*, 880

F.2d 1381 (D.C. Cir. 1989), the D.C. Circuit wrote:

> The relevant legislative history is simple to state: because one of the purposes of FOIA is
> to encourage the dissemination of information in Government files, as Senator Leahy (a
> sponsor) said: "It is critical that the phrase representative of the news media' be broadly
> interpreted if the act is to work as expected.... In fact, any person or organization which
> regularly publishes or disseminates information to the public ... should qualify for
> waivers as a `representative of the news media.'" Id. at 1385-86.

As the court in *Electronic Privacy Information Center v. Department of Defense*, 241 F.

Supp. 2d 5 (D.D.C. 2003) noted, this test is met not only by outlets in the business of publishing

such as newspapers; instead, citing to the *National Security Archives* court, it noted one key fact

is determinative, the "plan to act, in essence, as a publisher, both in print and other media."

*EPIC v. DOD*, 241 F.Supp.2d at 10 (emphases added). "In short, the court of appeals in National



Security Archive held that '[a] representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience.'" *Id.* at 11. *See also, Media Access Project v. FCC*, 883 F.2d 1063, 1065 (D.C. Cir. 1989).

Specifically, E&E Legal is a publisher of books and reports that address matters associated with energy, the environment and federal bureaucratic pathologies.[10]  E&E Legal published Greg Walcher's "Smoking Them Out – The Theft of the Environment and How to Take it Back."  It published seven reports on the true cost of renewable portfolio standards.[11] FME Law and E&E Legal co-published a legal treatise "Protecting Federalism and State Sovereignty through Anti-Commandeering Litigation." In addition, E&E Legal publishes a quarterly newsletter entitled E&E Legal Letters in which its General Counsel, Senior Legal Fellow Horner, staff attorneys and guest experts author an informative and educational article on an aspect of the law that emerges as part of E&E Legal's activities, including its transparency initiative.[12]

---

[10] Requesters point to their website for examples of its reports and publications. See http://eelegal.org/?page_id=2070.

[11] *See* True Cost of Renewable Portfolio Standards, http://eelegal.org/?page_id=1734.

[12] See http://eelegal.org/?page_id=1798.



E&E Legal publishes materials based upon its research via print and electronic media, as well as in newsletters to legislators, education professionals, and other interested parties.[13]  FME Law publishes scholarly works and contributes to non-scholarly media as experts on bureaucratic governmental practices.[14]  Those activities are in fulfillment of E&E Legal and FME Law's purposes and missions. We intend to disseminate the information gathered by this request to the public at large and at no cost through one or more of the following: (a) newsletters; (b) opinion pieces in newspapers or magazines; (c) E&E Legal and FME Law's websites; (d) in-house publications for public dissemination; (e) scholarly articles prepared for publication in peer-reviewed law journals (f) other electronic journals, including blogs to which our professionals contribute; (g) local and syndicated radio programs dedicated to discussing public policy; (h) to the extent that Congress or states engaged in relevant oversight or related legislative or judicial activities find that which is received noteworthy, it will become part of the public record on deliberations of the legislative branches of the federal and state governments on the relevant issues.  E&E Legal and FME Law staffs also intend to disseminate the information gathered by this request via media appearances.

_____

[13] *See EPIC v. DOD*, 241 F.Supp.2d 5 (D.D.C. 2003) (court ruled that the publisher of a bi-weekly electronic newsletter qualified as the media, entitling it to a waiver of fees on its FOIA request); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1181-82 (10th Cir. 2005) (fee waiver granted for group that "aims to place the information on the Internet"; "Congress intended the courts to liberally construe the fee waiver requests of noncommercial entities").

[14] *See e.g.,* FME Law Director participation on a panel dealing with use of FOIA with respect to scientific endeavors, most particularly the instant requesters', sponsored by the National Academy of Sciences and George Washington University (April 1, 2014, Washington D.C.), relevant findings of which scholarly research E&E Legal intends to continue publishing in its publications.



E&E Legal, with FME Law's assistance, has produced two extensive reports, one on collusion between EPA and environmentalist pressure groups in its "war on coal", and another on what our and similar groups' use of FOIA has revealed about EPA operations and activities, more broadly.  E&E Legal has conducted several studies on the operation of government, government ethics and the degree to which agencies follow their own rules and laws controlling their administrative activities.

E&E Legal's publication of books, reports and newsletters far surpasses the publishing plan that was, standing alone, sufficient in *National Security Archive, v. Dep't of Defense*, 880 F. 2d at1386 (tax-exempt corporations achieve news media status through publication activities, including being a publisher of periodicals such as the E&E Legal Letter). *See also, Elec. Privacy Info. Ctr. v. DOD*, 241 F. Supp. 2d at 21-22 & 24-25 (tax-exempt corporations achieve news media status through publication activities, including being a publisher of periodicals such as the E&E Legal Letter); and *Id*. at 27 ("The fact that EPIC's newsletter is disseminated via the Internet to subscribers' e-mail addresses does not change the analysis."); and see, *Media Access Project v. FCC,* 883 F.2d 1063, 1070 (D.C. Cir. 1989) ("In the case sub judice, the Commission virtually concedes that petitioners [People for the American Way] and [Union of Concerned Scientists] would qualify for preferred status as representatives of the news media" due to their "regular publication of a newsletter or periodical.").

In addition to print publications, E&E Legal and FME Law professionals appear regularly on national television and national and local radio shows to discuss their work on matters of energy and environmental policy.

The Free Market
Environmental Law Clinic

We conclude by noting, "In short, the court of appeals in National Security Archive held that '[a] representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience.'" *EPIC*, 241 F.Supp. at 11.[15] As already discussed with extensive supporting precedent, government information is of critical importance to the nonprofit policy advocacy groups engaged on these relevant issues, news media covering the issues, and others concerned with Agency activities in this controversial area or, as the Supreme Court once noted, what their government is up to.

For these reasons, requester E&E Legal and FME Law qualify as "representatives of the news media" under the statutory definition, because each organization routinely gathers information of interest to the public, uses editorial skills to turn it into distinct work, and distributes that work to the public. *See Electronic Privacy Information Center v. Department of Defense*, 241 F.Supp. 2d 5 (D.D.C. 2003)(non-profit organization that gathered information and published it in newsletters and otherwise for general distribution qualified as representative of news media for purpose of limiting fees).  Courts have reaffirmed that non-profit requesters who are not traditional news media outlets can qualify as representatives of the new media for purposes of the FOIA, including after the 2005 amendments to FOIA. *See ACLU of Washington v. U.S. Dep't of Justice,* No. C09-0642RSL, 2011, 2011 U.S. Dist. LEXIS 26047 at *32 (W.D.

---

[15] *See also*, *Forest Guardians v. U.S. Dept. of Interior,* 416 F.3d 1173, 1181-82 (10th Cir. 2005) (fee waiver granted for group that "aims to place the information on the Internet"; "Congress intended the courts to liberally construe the fee waiver requests of noncommercial entities").



Wash. Mar. 10, 2011).  *See also Serv. Women's Action Network v. DOD*, 2012 U.S. Dist. Lexis

45292 (D. Conn., Mar. 30, 2012).  Because E&E Legal meets each prong of the *Nat'l Sec.*

*Archive* test, it qualifies as a representative of the news media and a fee waiver on that basis.

**In the Alternative, FME Law Qualifies as an Educational Institution under 5 U.S.C. §
522(a)(4)(ii)(II)**

In similar measure, FME Law qualifies as an educational institution. Under OMB

guidance, an institution of professional education or an institution of vocational education, which

operate a program or programs of scholarly research qualifies for a few waiver under FOIA.[16]

FME Law provides education to law students, its Director is an Adjunct Professor of Law

at George Mason University School of Law, it provides continuing legal education to attorneys in

Virginia (a vocational education function) and it conducts a program of research on bureaucratic

pathologies and Constitutional restraints to federal government overreach.  These facts reflect the

exact formulation for qualification for fee waiver under 5 U.S.C. §552(a)(4)(A)(ii)(II), as

explained by the White House Office of Management and Budget. Accordingly, any fees charged

under this categorization must be limited to duplication costs. The records requested are

available electronically and are requested in electronic format; as such, there are no duplication

costs other than the cost of a compact disc(s).

NIEHS must address this alternate basis for fee waiver in the event it denies fee waiver

on the basis of the public interest. Failure to do is *prima facie* arbitrary and capricious.

---

[16] See 52 Fed. Reg. 10014 (March 27, 1987).

The Free Market
Environmental Law Clinic

## CONCLUSION

We expect the you to release within the statutory period of time all segregable portions of responsive records containing properly exempt information, and to provide information that may be withheld under FOIA's discretionary provisions and otherwise proceed with a bias toward disclosure, consistent with the law's clear intent, judicial precedent affirming this bias, and President Obama's directive to all federal agencies on January 26, 2009. Memo to the Heads of Exec. Offices and Agencies, Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 26, 2009) ("The Freedom of Information Act should be administered with a clear presumption: in the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, or because of speculative or abstract fears").

FOIA specifically requires you to immediately notify requesters with a particularized and substantive determination, and of its determination and its reasoning, as well as requesters' right to appeal; further, FOIA's unusual circumstances safety valve to extend time to make a determination, and its exceptional circumstances safety valve providing additional time for a diligent agency to complete its review of records, indicate that responsive documents must be collected, examined, and reviewed in order to constitute a determination. *See CREW v. FEC*, 711 F.3d 180, 186 (D.C. Cir. 2013). *See also Muttitt v. U.S. Central Command*, 813 F. Supp. 2d 221; 2011 U.S. Dist. LEXIS 110396 at *14 (D.D.C. Sept. 28, 2011)(addressing"the statutory



requirement that [agencies] provide estimated dates of completion").  We request a rolling

production of records, should it be necessary, such that the agency furnishes records to

undersigned counsel's attention as soon as they are identified, preferably electronically, but as

necessary in hard copy to his attention. We inform NIEHS of our intention to protect our

appellate rights on this matter at the earliest date should NIEHS not comply with FOIA per, e.g.,

*CREW v. FEC*.  If you have any questions please do not hesitate to contact undersigned.

> Respectfully submitted,

> *Chaim Mandelbaum*

> ON BEHALF OF:
> The Free Market Environmental Law Clinic
> The Energy & Environment Legal Institute